# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| CURTIS SANDERS, JR., | CASE NO. 1:21-cv-00118 |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. |  |

Plaintiff Curtis Sanders, Jr. ("Plaintiff" or "Mr. Sanders") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefit (DIB).  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.       Procedural History

Mr. Sanders filed his application for DIB on April 29, 2019.  (Tr. 61, 213-16.)  He asserted a disability onset date of August 9, 2018.  (Tr. 61, 86, 217.)  He alleged disability due to back injury, gunshot wound, PTSD, depression, and sleep apnea.  (Tr. 118, 133, 151, 158, 235.)  His application was denied at the initial level (Tr. 151-53) and upon reconsideration (Tr. 158-

64).  He then requested a hearing.  (Tr. 165-66.)  A hearing was held before an Administrative

Law Judge ("ALJ") on May 13, 2020.  (Tr. 82-116.)

On June 2, 2020, the ALJ issued an unfavorable decision, finding Mr. Sanders had not

been under a disability from August 9, 2018, through the date of the decision.  (Tr. 58-81.)  Mr.

Sanders requested review of the ALJ's decision by the Appeals Council.  (Tr. 210-12.)  On

November 12, 2020, the Appeals Council denied Mr. Sanders' request for review, making the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Sanders was born in 1967 and was 51 years old at the alleged onset date, making him

an individual who was closely approaching advanced age at all relevant times.  (Tr. 117, 132,

213.)  He graduated high school, and was living with his wife at the time of the hearing in May

2020.  (Tr. 87-88.)   Prior to his alleged onset date, he worked for two different companies until

August 2018, driving a cement mixer and performing construction and carpentry work.  (Tr. 89,

93, 94-96.)  He also performed some side jobs, building decks and fences.  (Tr. 110.)  He then

worked for DoorDash from late-2019 through early-2020, making approximately two food

deliveries a week.  (Tr. 89-92.)

### B.      Medical Evidence

#### 1.      Treatment History

The ALJ identified numerous severe mental and physical impairments (Tr. 63) and

provided a detailed discussion of the medical evidence relating to those impairments (Tr. 64-75).

The summary below focuses on those records identified and highlighted by the parties on appeal.

###### i.     Physical Impairments

Mr. Sanders is approximately 5' 11" tall and treatment records during the relevant period generally reflect examinations showing a body mass index (BMI) score of 30 or above, with his weight ranging from 234 pounds to 246 pounds.  (Tr. 370, 388, 542, 1102, 1187.)

In May 2018, Mr. Sanders' primary care provider at MetroHealth, Joaquin Tinio, M.D., referred him to physical therapy for treatment of patellofemoral syndrome in both knees.  (Tr. 406.)  During his first physical therapy session on May 14, 2018, Mr. Sanders reported that his left knee pain was worse than the right, and that his pain was worse at night and with prolonged standing, sitting, walking, or getting in and out of the car.  (Tr. 402-04.)  He reported being able to drive independently but having difficulty performing housework.  (Tr. 404.)  He did not need an assistive device and presented with limited terminal knee extension bilaterally, decreased strength bilaterally in the knees and hips, and impaired left single leg balance.  (Tr. 405.)

On June 20, 2018, x-rays were taken of Mr. Sanders' knees to assess the progression of his known patellofemoral syndrome.  (Tr. 492-95.)  The x-ray of the right knee showed smoothly marginated remote fragment in relationship to the medial femoral condyle with normal joint space (Tr. 492-93.)  The left knee x-ray showed development of small joint effusion, mild degenerative osteoarthritis without significant change, and no evidence of acute fracture or dislocation.  (Tr. 494-95.)

An MRI of the left knee was performed on July 6, 2018 due to "new onset of medial pain with block to flexion, r/o displaced medial meniscal tear."  (Tr. 489-90.)  The MRI noted a displaced flap tear of the medial meniscus and significant loss of the inner edge of the body of the medial meniscus with medial extrusion (Tr. 489-92.)  The report also noted a possible tiny

displaced fragment along the intercondylar notch and multiple areas of full thickness cartilage loss in the medial femoral condyle was seen.  (*Id*.)

On July 18, 2018, Mr. Sanders saw Laurel Beverley, M.D. at MetroHealth for follow up regarding his left knee.  (Tr. 387.)  He reported that he was a construction / concrete worker and had been placed on restricted duty based on a physician's recommendation.  (*Id*.)  He reported that resting from work had helped his knee symptoms, with his left knee medial pain somewhat improved, but that he was having intermittent sharp pain in the medial left knee.  (*Id*.)  He also reported associated "giving way especially on ladders," with recurrent swelling.  (*Id*.)  His ability to ambulate was mildly limited without use of an assistive device and he reported some relief with NSAIDs and acetaminophen.  (*Id*.)  He noted that he had not had injections, but had completed physical therapy and occasionally performed home exercises.  (*Id*.)  He was not using a knee brace, even though it provided him relief in the past, because it was uncomfortable to wear while working.  (*Id*.)  Physical examination of his bilateral lower extremities showed: mild effusion and medial joint line tenderness on the left, but no effusion or tenderness on the right; knee stiffness; bilateral patellofemoral crepitus; left knee McMurray test positive; pain medially without clicking and negative pain laterally without clicking; positive patellofemoral grinding; left groin tenderness and stiff and mildly painful range of motion of the left hip; full range of motion and no pain in right hip; intact sensation to light touch; and 5/5 bilateral strength in the hip flexors, quadriceps, and hamstrings.  (Tr. 387.)  Mr. Sanders was diagnosed with: bilateral knee patellofemoral chondromalacia with bilateral quadriceps tightness, improved; left knee degenerative medial meniscal tear and medial compartment arthritis; overweight BMI>30 with partially muscular build; and left hip pain NOS.  (Tr. 388.)  Dr. Beverley recommended over-the-

counter medication and home exercises for the bilateral patellofemoral symptoms and arthroscopy for the left knee mechanical symptoms.  (*Id*.)

On August 9, 2018, Mr. Sanders was the victim of a gunshot wound to his left back.  (Tr. 378-86.)  He was transported to MetroHealth that day and evaluated by Joseph Piktel, M.D.  (Tr. 378, 386.)  He reported that he was washing his car at home and "heard a bang" and felt pain in his left shoulder and back and experienced loss of consciousness.  (*Id*.)  A chest x-ray showed metallic shrapnel overlaying the left mid-chest and a CT chest scan showed posterolateral left upper chest gunshot wound with a retained bullet fragment between the inferior scapula and lateral seventh rib with no intra thoracic shrapnel / bullet fragment and no pneumothorax.  (Tr. 380-81.)  A left scapula x-ray showed a nondisplaced fracture through the inferior scapula and retained bullet fragment between the scapular and lateral ribs.  (Tr. 380.)  A CT of the thoracic spine showed no fracture or destructive lesion, the facets were normally aligned with minimal degenerative changes present, and there was no periverbetral hematoma.  (Tr. 381.)  Mr. Sanders was diagnosed with a left scapular fracture and discharged in stable condition with information relating to victim services and instructions to follow up with orthopedics.  (Tr. 381, 386.)

On August 20, 2018, Mr. Sanders saw Heather Vallier, M.D. at MetroHealth for an orthopedic consultation.  (Tr. 374-75.)  He reported that his pain was worse with movement of his shoulder and with any standing or walking activity.  (Tr. 375.)  He also reported that he was having trouble sleeping, secondary to pain.  (*Id*.)  He relayed that he stopped using his sling, but he was "very apprehensive" about trying to use his arm.  (*Id*.)  He also reported that he was afraid to leave his house or get into his car.  (*Id*.)  He denied a prior history of shoulder problems or mental health or posttraumatic stress type symptoms.  (*Id*.)  Mr. Sanders was observed to be nervous initially, but generally calm, pleasant, interactive, and appropriate throughout the

examination.  (*Id*.)  The physical examination revealed a normal gait with good balance and coordination, symmetrical chest rise with no focal pain in the chest wall, well-healed gunshot wound, normal muscle tone, and scapulothoracic and glenohumeral active and passive motion that was "smooth with no instability, mechanical block and with normal muscle tone."  (*Id*.)  On examination, Mr. Sanders could "forward flex his shoulder from 0 to 100 degrees with abduction from 0-90 degrees" and Dr. Vallier could passively "get him to 120 and 100 respectively in each of those planes."  (*Id*.)  Dr. Vallier noted that Mr. Sanders' rotator cuff was intact, but strength testing was limited due to his pain and apprehension.  (*Id*.)  She also observed a small amount of swelling in the fingers consistent with his injuries.  (*Id*.)  Mr. Sanders was diagnosed with status-post gunshot wound to the left shoulder causing a minimally displaced scapular fracture that did not require reduction or fixation, and that was "amenable to nonoperative management."  (*Id*.)  Dr. Vallier advised Mr. Sanders regarding his associated soft-tissue injury, which she felt was healing.  (*Id*.)  She instructed him to gradually progress his active and passive range of motion with his shoulder, and stated he could gradually return to work and recreational activities in the ensuing weeks, with some possible modifications of heavy lifting and work duties for four to six weeks.  (*Id*.)  Dr. Vallier noted his reported anxiety and stress related to the gunshot injury and indicated he was scheduled to see a mental health provider.  (*Id*.)  The plan included a follow-up visit with diagnostic imaging in six weeks.  (*Id*.)

On October 1, 2018, Dr. Beverley performed Mr. Sanders' left knee arthroscopy with meniscectomy surgery.  (Tr. 363-65.)  After his knee surgery, Mr. Sanders presented to John Como, M.D. at MetroHealth on October 3, 2018 for a trauma surgery consult regarding left upper back pain.  (Tr. 361-63.)  Dr. Como observed that Mr. Sanders' gunshot wound had healed, with no erythema, edema, warmth, or other signs of infection.  (Tr. 363.)  Dr. Como

6

found "no indication for surgical intervention" but recommended follow up with orthopedic surgery.  (*Id*.)  Mr. Sanders declined physical therapy or physical medicine and rehabilitation referrals.  (*Id*.)

On October 17, 2018, Mr. Sanders returned to Dr. Beverley for a post-operative appointment.  (Tr. 361.)  He reported that his knee pain was managed well, mostly with Advil and rare use of Norco.  (*Id*.)  He reported moderate knee swelling but denied numbness, tingling, fevers, chills, vascular complaints, or swelling in the calf or thigh.  (*Id*.)  He stated that he had been working on his knee exercises as instructed and was ambulating without crutches.  (*Id*.)  Examination of the left knee showed moderate effusion, with some tenderness along the joint lines only.  (*Id*.)  Mr. Sanders' range of motion in the left knee was from 5 to 90 degrees with flexion arc.  (*Id*.)  Dr. Beverley noted minimal peri-incisional numbness, no crepitus, and intact strength in the quadriceps, hamstrings, anterior tibialis, and gastroc-soleous.  (*Id*.)  Dr. Beverley also commented that Mr. Sanders was doing well post-operatively.  (*Id*.)  He was diagnosed with patellofemoral syndrome and medial compartment degenerative joint disease, with recommendations to continue home exercises.  (*Id.*)  He was advised to: return to all other activities as comfortable; use ice, elevation, and over the counter NSAIDs for pain and swelling; and return as needed.  (*Id*.)

On October 22, 2018, Mr. Sanders returned to Dr. Vallier.  (Tr. 360.)  He reported that his left shoulder was continuing to improve, noting "some mild aching and stiffness with extremes of motion and with heavy lifting."  (*Id*.)  He indicated that he had not had any formal physical therapy.  (*Id*.)  He said he was seeing a psychiatrist for PTSD symptoms, which was helpful.  (*Id*.)  Dr. Vallier observed that Mr. Sanders' range of motion in the left shoulder was "nearly symmetrical with the unaffected right side."  (*Id*.)  He exhibited "some mild pain in his

posterior trunk with shoulder musculature with extremes of motion," but there was "no mechanical block or instability noted" and the "[d]istal CMS [was] intact." (*Id*.) X-rays of the left shoulder showed the fracture was healed with the position of the bullet fragment unchanged as compared to prior films. (Tr. 360, 475.) Dr. Vallier referred Mr. Sanders to physical therapy for range of motion, strengthening, and conditioning, and noted that there were no restrictions. (Tr. 360.) She instructed him to follow up with the orthopedic clinic as needed, and encouraged him to follow up regarding his mental health. (*Id*.)

On November 21, 2018, Mr. Sanders saw Katherine Long, PT at MetroHealth for a physical therapy evaluation regarding his left shoulder pain. (Tr. 354.) He complained of left shoulder pain posteriorly, especially with lifting his left upper extremity above shoulder height, which caused sharp pain. (Tr. 355.) He reported difficulty reaching overhead and an inability to work. (Tr. 356.) PT Long found he presented with full but painful range of motion of the right shoulder, with significant strength deficits of the left shoulder, namely in the rotator cuff. (Tr. 357.) She also noted that he had limited functional mobility in lifting, reaching, and carrying heavy objects, which was preventing him from returning to his contractor work. (*Id*.) She indicated he would benefit from physical therapy. (*Id*.)

Between December 2018 and May 2019, Mr. Sanders attended fourteen physical therapy sessions for his left shoulder. (Tr. 303-28, 348-50, 351-53, 663-67, 872-81.) He also attended eight physical therapy sessions for his left knee from the end of December 2018 through early-February 2019. (Tr. 329-47.)

During a January 2019 therapy session for his knee, Mr. Sanders reported having pain only when working out with his daughter, mostly with pivoting and squatting. (Tr. 338.) He acknowledged having been instructed not to perform exercises that cause him knee pain, but

reported he continued to work out "through the pain." (*Id*.)  During a February 4, 2019 therapy session for his left knee, Mr. Sanders reported feeling fine but indicated he had stood a lot over the weekend and "got pain standing a long time." (Tr. 329, 805.)

Mr. Sanders returned to Dr. Vallier on February 11, 2019 for follow up regarding his left shoulder. (Tr. 328.)  He reported he had resumed activities with his left shoulder but had not returned to his heavy construction work because of his concerns regarding his left shoulder. (*Id*.)  He reported improved mobility, but said his physical therapist had stopped seeing him because he had been experiencing pain with certain overhead and forward reaching activities. (*Id*.)  He discussed being treated for his left knee but denied active knee symptoms. (*Id*.)  He reported ongoing mental health issues relating to the gunshot incident. (*Id*.)  Upon initial examination, Waddell signs were positive 1/5 for some non-anatomic tingling. (Tr. 328.)  On repeat examination, however, Mr. Sanders reported intact sensation in the arms, fingers, and legs. (*Id*.)  His balance and coordination were described as excellent. (*Id*.)  Dr. Vallier noted some diffuse pain in his deltoid musculature with certain forward or overhead reaching activities. (Tr. 328-29.)  X-rays of the left scapula showed that the nondisplaced fracture at the inferior angle of the scapula had not changed significantly since October 22, 2018. (Tr. 329, 472.)  Dr. Vallier recommended that Mr. Sanders return to physical therapy to work on unrestricted stretching and strengthening activities. (Tr. 329.)  Mr. Sanders was interested in a second opinion. (*Id*.)  Dr. Vallier provided him with names of other musculoskeletal providers and advised him to return to her as needed. (*Id*.)

On February 27, 2019, Mr. Sanders attended therapy for his left shoulder, reporting that he had some increased pain after having helped his daughter pack and move. (Tr. 322.)  On April 25, 2019, he reported he still had pain with movement and activities, noting he had to turn

9

down several work projects, including building a deck for someone, because he could not physically perform the work.  (Tr. 303.)   He presented with full but painful range of motion in his right shoulder, significant strength deficits in his left shoulder (primarily in his rotator cuff), and was limited with functional mobility, lifting, reaching, and carrying heavy objects.  (*Id*.)  PT Long indicated Mr. Sanders was improving with strength, but continued to exhibit pain at approximately 90-degree elevation.  (Tr. 305.)

During a May 11, 2019, session, Mr. Sanders reported having a lot of pain the night before due to helping his son mount a large television, stating "I know I can't really lift without pain, but I helped him anyway."  (Tr. 877.)  He explained that he had to take something for his pain and had been unable to sleep, but said a hot shower that morning had helped a lot.  (*Id*.)  PT Long indicated Mr. Sanders was able to perform functional strengthening in the lower ranges, but that it was too painful for him to try doing things above shoulder height.  (Tr. 880.)  She indicated that his "pain with scapular movement across bullet fragment remain[ed] disabling, disallowing him from doing repetitive overhead work."  (*Id*.)

At Mr. Sanders' final physical therapy session on May 28, 2019, he reported having increased pain the day before while he was working on a deck, saying it was painful for him to reach for and pick up heavy items.  (Tr. 663.)  He reported not feeling overall improvement and having intolerable pain with certain movements required for his regular activities, but also reported feeling that his arm was stronger.  (*Id*.)  PT Long indicated Mr. Sanders demonstrated improved range of motion within functional limits, but that pain was inhibiting him after a couple of repetitions.  (Tr. 666.)  She indicated Mr. Sanders would be discharged from physical therapy "due to plateau in pain improvements with good strength improvements."  (Tr. 666-67.)

10

On June 28, 2019, Mr. Sanders saw PM&R physician Nida Aziz, D.O. at MetroHealth for his left shoulder pain.  (Tr. 911-13, 955.)  He reported a history of obesity, depression, and PTSD, with his chief complaint being left shoulder pain.  (Tr. 911.)  He reported attending physical therapy up until about two months earlier, and said his pain was usually a 7/10 with minimal relief with use of ibuprofen.  (*Id*.)  On examination, he displayed tenderness to palpation over the injury site.  (Tr. 913.)  The examination findings were otherwise unremarkable.  (*Id*.)  He was diagnosed with left shoulder pain and nondisplaced fracture of the interior angle/tip of the scapular status-post gunshot wound.  (*Id*.)  Dr. Aziz recommended pool and land therapy, weight control, and gabapentin.  (*Id*.)  Dr. Aziz also discussed trigger point injections as a possible treatment to help with myofascial pain symptoms.  (*Id*.)

Mr. Sanders resumed physical therapy, seeing PT Long for nine more sessions between July and October 2019.  (Tr. 948-57, 1032-47, 1054-1101, 1114-20.)  When Mr. Sanders returned to therapy on July 15, 2019, he reported his pain was particularly bad when waking in the morning, reaching out to his left side, or turning his body.  (Tr. 955.)  He reported doing some home exercises since May 2019, but said he avoided the extremely painful exercises.  (*Id*.)  He said he could "do most things, including reaching overhead, 'but after so many times I can't do anymore or deal with the pain.'"  (*Id*.)

During an August 19, 2019 therapy session, Mr. Sanders reported that he continued to be "pain-free at rest" but rated his pain at "solid 6/10 with any movement."  (Tr. 1078.)  PT Long indicated that Mr. Sanders continued to have pain during the session, mainly with overhead reaching.  (Tr. 1081.)  She found Mr. Sanders "was able to complete and demonstrate increased capacity for strengthening despite heightened pain."  (*Id*.)  She noted that he continued to be a good candidate for physical therapy.  (*Id*.)  On September 17, 2019, PT Long indicated that Mr.

11

Sanders continued to have pain and remained challenged with dynamic stabilization and serratus strengthening exercises, but was "improving with distal [upper extremity] strength/scapular stability."  (Tr. 1097.)

Plaintiff returned to Dr. Aziz on October 4, 2019 for follow up.  (Tr. 1106.)  He reported gradual improvement since his June 2019 visit.  (*Id*.)  He described his pain as "dull, crampy, intermittent, chronic, without weakness and without sensory changes" and reported his pain was worse with "certain movements of his arms, abduction and adduction and raising [his] arms overhead."  (*Id*.)  He reported no pain with rest.  (*Id*.)  He reported that his medications included ibuprofen 800 mg and gabapentin 600 mg.  (Tr. 1107.)  On examination, he had musculoskeletal tenderness.  (*Id*.)  His diagnoses from June 2019 were unchanged.  (*Compare* Tr. 917 *with* Tr. 1107.)  Dr. Aziz continued to recommend pool therapy and weight control, and reinforced the importance of a regular strength and flexibility program.  (Tr. 1108.)  Dr. Aziz also prescribed a TENS unit and tizanidine, and continued gabapentin.  (*Id*.)  Tigger point injections were again discussed as a possible treatment option for pain.  (*Id*.)

On October 15, 2019, Mr. Sanders reported to PT Long that he lifted something two weeks earlier that caused pain in both elbows and both shoulders, but that the elbow pain had "calmed down."  (Tr. 1114.)  He continued to report no pain while at rest but increased pain with activity.  (*Id*.)  PT Long indicated Mr. Sanders' "scapular stability [was] much improved," but he "remain[ed] highly painful with all reaching and overhead activities."  (Tr. 1117.)  PT Long noted that she taught him "an extensive program to maintain [range of motion] and progress strengthening, and functionally he [had] met many objective goals."  (*Id*.)  She instructed him to continue with his home exercise program and discharged him from physical therapy "due to plateau in [patient] progress."  (*Id*.)

### ii.    Mental Health Impairments

On September 20, 2018, Mr. Sanders attended a mental health assessment with Eliot Gutow, LSW at MetroHealth.  (Tr. 646-50).  He reported that his personality changed after recently being shot, explaining that he was more isolated and irritable, he socialized less, he was sad, his sleep and concentration were poor, he was worrying constantly, and he was having nightmares and flashbacks.  (Tr. 646.)  On mental status exam, his mood was dysphoric but his affect was congruent, he was well groomed and oriented to time, person, and place, his concentration was sustained, he was cooperative with clear speech, his thought process was logical, his thought content and cognitive findings were appropriate, and his insight and judgment were good.  (Tr. 649.)  Mr. Sanders was diagnosed with PTSD.  (Tr. 650.)  LISW Gutow recommended counseling.  (*Id*.)

After his September 2018 assessment, Mr. Sanders attended counseling sessions with LISW Gutow and then Elevani Fletcher, LPCC-S at least through February 2020.  (Tr. 639-41 (10/19/2018), 730-31 (11/8/2018), 733-34 (11/19/2018), 761-62 (12/26/2018), 774-75 (1/11/2019), 785-86 (1/17/2019), 792-93 (1/25/2019), 581-82 (1/31/2019), 565-66 (2/7/2019), 558-60 (2/13/2019), 552-53 (3/8/2019), 535-37 (4/25/2019), 869-70 (4/30/2019), 895-96 (6/18/2019), 898-99 (6/24/2019), 1000-02 (7/31/2019), 1141-43 (8/30/2019), 1147-49 (9/6/2019), 1157-59 (10/7/2019), 1163-65 (10/14/2019), 1169-71 (11/11/2019), 1175-77 (12/9/2019), 1181-83 (12/23/2019), 1197-99 (1/6/2020), 1238-40 (1/17/2020), 1244-46 (2/10/2020), 1250-52 (2/28/2020).)  While he usually attended counselling sessions one to two times per month, he attended weekly in January 2019.  (*Id.*)

Mr. Sanders' counseling records reflect complaints of a dysphoric mood, self-isolation, anger and decreased tolerance, emotional distress regarding his traumatic injury, difficulty

13

focusing and concentrating, difficulty leaving the house, vivid dreams, hypervigilance, feeling alienated and disconnected from friends and work, not doing things he used to do prior to trauma, and life and family stressors (Tr. 552, 565, 588, 592, 595, 608, 633, 640, 869, 895, 898, 1001, 1007, 1141, 1147, 1157, 1163, 1169, 1175, 1181, 1197, 1238, 1244, 1251, 1510.)  Apart from a dysphoric mood and irritable behavior, mental status findings were generally normal, including euthymic mood, full range of affect, a well-groomed appearance, cooperative behavior, orientation to time, person, and place, a logical and organized thought process, good judgment and insight, recent and remote memory within normal limits, and sustained attention and concentration.  (Tr. 536, 582, 589, 595, 640, 896, 1001, 1142, 1148, 1158, 1164.)

During a visit with Dr. Tinio on November 19, 2018, Mr. Sanders complained of persistent problems since being shot, complaining of depression and insomnia.  (Tr. 358.)  Dr. Tinio indicated that Mr. Sanders should follow up with psychiatry as scheduled regarding his PTSD, and that they would discuss sleeping medication at a later visit.  (*Id.*)  Mr. Sanders returned to Dr. Tinio on November 23, 2018 and started trazadone for insomnia.  (Tr. 354.)

Mr. Sanders saw Karen Collins, APRN-CNP on December 5, 2018 at MetroHealth for pharmacologic management.  (Tr. 615-19.)  He relayed that LISW Gutow advised him to see CNP Collins because: he was not sleeping well; he felt like someone was watching him; he was having nightmares and flashbacks; he felt helpless, hopeless and worthless; he did not do things he used to do; and he had a lot of fear and anxiety.  (Tr. 617.)  On mental status examination, he was depressed, anxious, and paranoid that people who were friends with the man who shot him were following him.  (Tr. 618.)  Mental status examination also showed that he was adequately groomed with good hygiene, cooperative, calm, appropriate, in no acute distress, oriented, and talkative with spontaneous speech at a normal rate and flow.  (*Id.*)  He had logical and organized

thought processes, a full range of affect, sustained attention and concentration, his recent and remote memory were within normal limits, and his judgment and insight were good.  (*Id*.)   He was diagnosed with PTSD, insomnia due to PTSD, and mild depression, single episode.  (*Id*.)  CNP Collins started Mr. Sanders on Prozac and increased his dosage of trazodone.  (Tr. 619.)  She recommended medication management follow-up in three months and continued counseling with LISW Gutow.  (*Id*.)

Mr. Sanders returned to CNP Collins on February 4, 2019.  (Tr. 571-75.)  He reported sleeping six to seven hours each night with trazodone, and reported no side effects from Prozac. (Tr. 573.)  He reported having less anxiety, but did not think he was where he should be and was having "horrific nightmares."  (*Id*.)  He said therapy was helpful.  (*Id*.)  Mental status examination findings were similar to December 2018, except he did not exhibit paranoia and his mood was described as slightly depressed and anxious.  (*Id*.)  His diagnoses were unchanged. (Tr. 574.)  CNP Collins increased his Prozac dosage and continued him on trazadone.  (*Id*.)   She noted they would consider Prazosin for his nightmares at the next visit.  (*Id*.)  When Mr. Sanders returned to CNP Collins on April 4, 2019, his mental status findings and diagnoses were unchanged.  (Tr. 544.)  He reported feeling less anxiety and sleeping about five to seven hours each night.  (*Id*.)   CNP Collins added Prazosin for Mr. Sanders' nightmares and continued his Prozac and trazadone.  (Tr. 545.)

Mr. Sanders returned to CNP Collins on May 23, 2019.  (Tr. 882-85.)  He reported that his PTSD was affecting his family life and relationships.  (Tr. 883.)  He reported that the Prazosin was helping with his nightmares, but he was still having them.  (*Id*.).  Mental examination findings were generally the same, except his mood was depressed and anxious and his affect was full but tearful. (*Id*.)  His diagnoses were unchanged.  (Tr. 884.)  CNP Collins

15

increased Plaintiff's dosage of Prazosin and continued trazodone and Prozac.  (Tr. 884.)  She

recommended that Mr. Sanders continue with counseling and return in three months for

medication management.  (Tr. 885.)

On August 22, 2019, Mr. Sanders returned to CNP Collins.  (Tr. 990-94.)  He reported

that his nightmares were under control but he continued to have PTSD symptoms and anxiety.

(Tr. 992.)  He was "hanging in there," but missed his therapist because he had felt a connection

with him.  (*Id.*)  Mental status examination findings were similar to those from May 23, 2019.

(*Compare* Tr. 992 *with* Tr. 883.)  CNP Collins increased his dosage of Prozac and continued

trazodone and Prazosin at the same doses.  (Tr. 993.)

Mr. Sanders returned to CNP Collins on December 24, 2019.  (Tr. 1187-92.)  He reported

that he stopped taking Prazosin because his nightmares had stopped and he felt he was taking a

lot of medication, but realized he needed to start taking it again because he started having

nightmares and vivid dreams.  (Tr. 1188.)  He felt increasing Prozac was helpful because he was

having less anxiety, reporting that he left the house and visited a good friend out of state.  (*Id.*;

*see also* Tr. 1175.)  He also reported therapy was very helpful for his PTSD symptoms.  (Tr.

1188.)  Mental examination findings were unchanged.  (*Compare* Tr. 1189 *with* Tr. 992.)

During a January 6, 2020 counseling session, Mr. Sanders reported holding in his

emotions and feeling disconnected from loved ones and society.  (Tr. 1197.)  He reported that he

was spending time producing and mixing music, which was helping him feel better.  (*Id.*)  He

also reported that he had been working with his son to develop a business plan, but lacked the

financial resources to get started.  (*Id.*)  His mental status examination findings were generally

within the normal range.  (Tr. 1198.)

After the hearing, Mr. Sanders submitted mental health counseling and medication management records that post-date the ALJ's June 2, 2020 decision.  (ECF Doc. 14 p. 4 (citing Tr. 12-57).)  Mr. Sanders briefly mentions these records, but does not summarize or explain their relevance, nor does he seek a sentence six remand for consideration of new evidence.  It is not appropriate for the Court to consider these later dated records.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (explaining that "[o]nly evidence in the record below can be considered when determining whether or not the ALJ's opinion was supported by substantial evidence" and "the only method to have new evidence considered is to ask for a sentence six remand").

### 2.    Opinion Evidence

The opinion evidence consists of opinions from state agency medical and psychological consultants, and is summarized below.

### i.    State Agency Medical Consultants

On May 13, 2019, state agency medical consultant William Bolz, M.D. completed a physical RFC assessment on initial review, opining that Mr. Sanders was limited to light exertional work with the following additional limitations:

- frequent pushing/pulling with the left upper extremity;

- frequent climbing ramps/stairs, kneeling, and crouching;

- occasional climbing ladders/ropes/scaffolds and crawling;

- occasional reaching overhead and frequent reaching in front and laterally with the left shoulder; and

- avoidance of concentrated exposure to cold and moderate exposure to hazards.

(Tr. 125-27.)

17

On September 11, 2019, state agency reviewing medical consultant Venkatachhala Sreenivas, M.D. completed a physical RFC assessment on reconsideration, affirming Dr. Bolz's opinions, but also opining Mr. Sanders should avoid all exposure to hazards.  (Tr. 143-45.)

### ii.    State Agency Psychological Consultants

On initial review, on May 24, 2019, state agency psychological consultant Irma Johnston, Psy.D. completed a Mental Residual Functional Capacity Assessment.  (Tr. 127-28.)  Dr. Johnston opined that Mr. Sanders:

- had no understanding and memory limitations;

- had no sustained concentration and persistence limitations;

- was capable of occasional intermittent interaction with others; and

- was capable of routine tasks with regular expectations and few changes.

(*Id*.)

At the reconsideration level, on September 11, 2019, state agency psychological consultant Robyn Murry-Hoffman, Ph.D. completed a Mental Residual Functional Capacity Assessment, affirming Dr. Johnston's findings.  (Tr. 145-47.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At his May 13, 2020, hearing, Mr. Sanders testified in response to questioning by the ALJ and his representative.  (Tr. 87-110.)   The ALJ asked Mr. Sanders to explain why he had been unable to work full-time since August 2018.  (Tr. 96-97.)  In response, Mr. Sanders testified that he had problems with his left shoulder, problems being around people, and problems focusing.  (Tr. 97-98; *see also* Tr. 110.)  He reported having problems reaching out or reaching over his shoulder.  (Tr. 98.)  Because of his long history performing manual work, he reported he

would sometimes forget about the bullet inside him and get a sharp pain in his back where the bullet is located when moving or reaching out in front of him.  (*Id*.)  When that happened, it could take thirty to forty-five seconds for the sharp pain to subside.  (Tr. 98-99.)

He reported he could drive without any restrictions.  (Tr. 89.)  Even though he had problems reaching, he explained that driving was not really an issue for him beause: "I don't have to put my arms out in front of me to drive.  And I tend to use my right hand more than my left hand when I'm driving . . . I'm right-handed, so I don't really drive with my left hand so much."  (Tr. 99.)  He also reported being unable to stand for longer than thirty to forty-five minutes without pain due to problems with his knees.  (Tr. 106-07.)  He explained that he had to "walk a little bit just to relieve the pain a little bit."  (Tr. 107.)

Mr. Sanders attributed his mental health issues to the fact that the individual who shot him continued to live behind him.  (Tr. 100.)  He reported forgiving his neighbor, but still questioned whether the shooting incident was intentional because of things his neighbor said to him prior to the incident, and was not able to go in his backyard if his neighbor was out back.  (Tr. 100-01.)  He reported having difficulties sleeping and waking up because of sweating or needing to check cameras he had installed around his house.  (Tr. 101-02.)  He explained that he did not go out like he used to, and would get very nervous if he saw a white Jeep Cherokee because it was the type of car his neighbor drove.  (Tr. 102.)

He reported that he tried to contribute to chores around his house, including laundry and yardwork, but that yardwork took him much longer than in the past and that he sometimes had assistance from a younger neighbor.  (Tr. 102-04.)  He reported that his wife did the shopping and most of the cooking.  (Tr. 103.)  He described feeling frustrated about not being able to go out and having to talk to his counselor on the phone rather than see her in person due to the

Covid-19 pandemic.  (Tr. 97-98, 104.)  He reported that he lost his father the week before the
hearing due to the virus.  (Tr. 97.)  He felt he would have been farther along with respect to his
ability to deal with the public if not for the pandemic.  (Tr. 105-06.)  He reported that friends
occasionally visited him for brief periods of time, but he had not really hung out with friends for
two years.  (Tr. 106.)  He described taking several medications, including medications for his
depression and nightmares, which caused drowsiness.  (Tr. 107-09.)  He stated he had problems
sleeping and nightmares even with medication.  (Tr. 108-09.)  When asked about his problems
with concentration or focus, Mr. Sanders explained that he struggled remembering things and
concentrating on things that he was supposed to be focused on.  (Tr. 109-10.)

### 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 110-15.)   The VE classified
Mr. Sanders' past work as concrete laborer from a mixing plant, a heavy exertional, unskilled
job.  (Tr. 111-12.)   For her sole hypothetical, the ALJ asked the VE to assume an individual Mr.
Sanders' age and with his education and work experience who:

> can perform the full range of light work, but with the following additional
> limitations.  He or she can frequently push and pull with the left upper extremity,
> frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds,
> frequently kneel and crouch, occasionally crawl.  He or she can occasionally
> perform left overhead reaching and frequent reaching front and laterally.  This
> individual can be frequently exposed to extreme cold, never be exposed to hazards
> of unprotected heights.   This individual . . . can occasionally interact with
> supervisors, coworkers and the public and is also limited to routine workplace
> changes.

(Tr. 112.)  The ALJ clarified that the upper extremity limitations were "all affected from the left
side."  (Tr. 112-13.)  The VE testified that the described individual would be unable to perform
Mr. Sanders' past work, but there would be other jobs the described individual could perform,
including inspector and sorter, hand packager, and general production worker.  (Tr. 113-14.)

Mr. Sanders' counsel then asked the VE her opinions regarding employer tolerances for absenteeism and being off task.  (Tr. 114-15.)  The VE explained that normally one absence per month would be accepted, unless there was a recurring pattern of absences, and that fifteen percent off-task time would start to exceed customary off-task tolerances.  (*Id*.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In her June 2, 2020 decision, the ALJ made the following findings:[1]

1.     The claimant meets the insured status requirements through December 31, 2022.  (Tr. 63.)

2.     The claimant has not engaged in substantial gainful activity since August 9, 2018, the alleged onset date.  (*Id*.)

3.     The claimant has the following severe impairments: fractures of upper limb (left shoulder), other and unspecified arthropathies (bilateral knee patellofemoral chondromalacia; status post left medial meniscectomy and chondroplasty), obesity, trauma, and stressor-related disorders, and depressive, bipolar, and related disorders.  (*Id*.)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 64-66.)

5.     The claimant has the residual functional capacity to perform light work except he can frequently push and pull with the left upper extremity, he

---

[1] The ALJ's findings are summarized.

can frequently climb ramps and stairs, he can occasionally climb ladders, ropes, and scaffolds, he can frequently kneel and crouch, he can occasionally crawl, he can occasionally perform left overhead reaching, he can frequently perform left reaching in front and laterally, he can frequently be exposed to extreme cold, he can never be exposed to hazards of unprotected heights, he can occasionally interact with supervisors, coworkers, and the public, and he is limited to routine workplace changes. (Tr. 66-75.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 75.)

7.    The claimant was born in 1967 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. (*Id*.)

8.    The claim has at least a high school education and can communicate in English. (*Id*.)

9.    Transferability of job skills is not an issue because claimant's past work was unskilled. (*Id*.)

10.   Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that he can perform such as inspector and sorter, hand packager, and general production worker. (Tr. 75-76.)

Based on the foregoing, the ALJ determined that Mr. Sanders had not been under a disability from August 9, 2018, through the date of the decision. (Tr. 76.)

## V.    Plaintiff's Arguments

Mr. Sanders challenges the constitutional authority of the Commissioner to decide his case, and raises substantive objections to her decision as follows:

1.    The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul was constitutionally defective. (ECF Doc. 14 pp. 1, 7-9; ECF Doc. 17 pp. 2-7.)

2.    The ALJ committed harmful error forming the RFC when she failed to properly evaluate the evidence documenting Sanders' severe impairments and failed to make a proper determination at Step Three of the Sequential Evaluation and/or failed to provide substantial evidence to support her RFC for work at the light level of exertion. (ECF Doc. 14 pp. 1; ECF Doc. 17 pp. 1-2.)

23

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

24

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will not be upheld if the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether Mr. Sanders Has Standing to Challenge ALJ Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Mr. Sanders argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles. (ECF Doc. 14 pp. 1, 7-9; ECF Doc. 17 pp. 2-7.)  Specifically, he argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term than the President of the United

25

States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*.  (ECF Doc. 14 pp. 7-8 (challenging 42 U.S.C. § 902(a)(3)).)  Mr. Sanders argues based on this precedent that the ALJ's authority to issue the decision in this case was "constitutionally defective" because her authority was delegated from the Commissioner, and because the ALJ's decision was improperly based on regulations promulgated by the former Commissioner without authority.  (ECF Doc. 14 pp. 1, 7-8; ECF Doc. 17 pp. 2-7.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 16-1 p. 14 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Mr. Sanders is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (*Id.* at p. 14 (citing *Collins v. Yellen*, ─── U.S. ───, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the Commissioner argues that Mr. Sanders cannot show harm to support his claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Mr. Sanders cannot show that the removal restriction caused the denial of his benefits.  (ECF Doc. 16-1 p. 14.)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with numerous other courts that Mr. Sanders' constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Mr. Sanders lacks

standing to assert the challenge.[2]  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec*., --- F.Supp.3d ---, 2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec*., No. 3:20-cv-5602-TLF, 2021 WL 5276522, *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.")  Although the Commissioner did not directly challenge Mr. Sanders' standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt.  *See Loren v. Blue Cross & Blue Shield of Mich*., 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ⸻ U.S. ⸻, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Mr. Sanders did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein.

---

[2] The Commissioner also argues that Mr. Sanders' request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential considerations.  (ECF Doc. 16-1 pp. 14-25.)  Because the undersigned concludes that this Court does not have standing to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

(ECF Doc. 16-1 pp. 15-16.) *See also Rhouma*, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Mr. Sanders must satisfy a three-pronged test to establish Article III standing, namely: "[he] must show that [he] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [he] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void." 141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))).   However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone." 141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction in this case, Mr. Sanders bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 589 (2006).  Mr. Sanders argues that the requirements for standing are met because the Commissioner did not argue otherwise, and for the reasons set forth in two district court cases addressing similar constitutional challenges.  (ECF Doc. 17 p. 2 (citing *Brinkman v. Kijakazi*, No.  2:21-CV-00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Mr. Sanders has successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* did face a similar challenge to an ALJ decision based on the alleged unconstitutionality of the statutory removal provision for the Commissioner of Social Security under *Seila Law*.  2021 WL 4462897, at *1.  And contrary to the argument offered by Mr. Sanders in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. Because Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional challenge."  *Id.* at *2 (emphasis added).  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing."  *Id.* (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S.Ct. at 1779).  This case clearly does not support a finding that Mr. Sanders has demonstrated standing to pursue his constitutional claim in this case.

29

In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3. In so finding, the court relied in part on another court's observation that "[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate." *Id.* (quoting *Tafoya v. Kijakazi*, No. 21-CV-00871-REB, 551 F.Supp.3d 1054, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)). Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null." *Tafoya*, 551 F.Supp.3d at 1061.

Consistent with the findings in *Sylvia* and *Tafoya*, Mr. Sanders asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner. (ECF Doc. 14 p. 8; ECF Doc. 17 pp. 2-3.) In other words, he contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to her. However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211). The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void." *Id.* at 1787 (emphasis in original). In so finding, the Court

30

distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether Mr. Sanders was "harmed by an action that was taken by [the SSA Commissioner] and that [she] alleges was void."  *Collins*, 141 S. Ct. at 1788, n. 24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Mr. Sanders asserts that the ALJ decided this case "based on regulations promulgated by Mr. Saul when he had no authority to issue the same," and more specifically that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015."  (ECF Doc. 14 p. 8; ECF Doc. 17 pp. 3-4.)

First, Mr. Sanders' arguments on this point are underdeveloped, as he has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Mr. Sanders must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected him.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Second, even a cursory review of the actions of the former Commissioner

identified by Mr. Sanders reflects that those actions are not traceable to harm asserted by Mr. Sanders in this case.  As to the identified changes to HALLEX, an internal procedural manual for the Social Security Administration, the cited change pertains to the way that Office of Hearings Operations staff will respond when a notice of hearing acknowledgement is not returned.  *See* HALLEX I-2-3-20.[3]  No challenge is raised in this case regarding deficiencies with the notices of hearing.  As to the identified changes to the musculoskeletal listings, it is evident that the identified changes took effect on April 1, 2021, almost one year after the ALJ's decision in this case (Tr. 58-81), and thus could not have impacted this decision.  *See* DI 34121.013.[4]  Unlike the shareholders in *Collins*, whose injury – the loss of net worth in companies in which they owned shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of the formula to calculate dividends, here Mr. Sanders has not demonstrated that the regulatory changes he identifies impacted the denial of benefits.  *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Mr. Sanders has failed to establish that he has suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge.  *See, e.g., Rhouma*,  2021 WL 5882671 at * 11 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to challenge the constitutionality of § 902(a)(3)."); *Catherine J.S.W.*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former

---

[3] The February 23, 2021 revision of HALLEX I-2-3-20 "updated and clarified the action that Office of Hearings Operations (OHO) staff will take if a claimant or appointed representative does not return an acknowledgment of the notice of hearing."  Transmittal I-2-240, Soc. Sec. Admi. Office of Analytics Review and Oversight, available at https://www.ssa.gov/OP_Home/hallex/TS/tsi-2-240.html#:~:text=This%20transmittal%20amends%20section%20I-2-3-20%20of%20the%20Hearings%2C,404.938%20and%20416.1438.%20Explanation%20of%20Content%20and%20Changes (last visited 4/1/2022).
[4] https://secure.ssa.gov/poms nsf/lnx/0434121013 (last visited 4/1/2022).

Commissioner Saul, under *Collins v. Yellin,* 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Mr. Sanders does not have standing to proceed with her separation of powers constitutional claim, the undersigned recommends that the Court deny Mr. Sanders' request for a remand based on the asserted constitutional challenge.

**C.    Second Assignment of Error: Whether Step Three and Step Four Findings are Supported by Substantial Evidence**

As it pertains to Mr. Sanders' second assignment of error, the undersigned finds the following issues were sufficiently identified and argued: (1) whether the ALJ erred in finding at Step Three that Mr. Sanders' physical impairments did not satisfy Listing 1.07, and that his mental health impairments did not satisfy Listings 12.04 or 12.15 (ECF Doc. 14 pp. 11-18); and (2) whether the ALJ properly considered the combination of Mr. Sanders' impairments and pain when assessing the RFC at Step Four, and sufficiently articulated the basis for the RFC (ECF Doc. 14 pp. 12-13,18-20; ECF Doc. 17 pp. 1-2).

To the extent Mr. Sanders intended to raise additional claims, they were raised in a perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *Hough*, 2014 WL 764634, at *9 (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

### 1.    Whether Step Three Findings are Supported by Substantial Evidence

At Step Three of the sequential evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).  An ALJ need not specifically articulate "every consideration that [goes] into [her] step three determination," and "there is no heightened articulation standard [at step three] where the ALJ's findings are supported by substantial evidence." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)

Mr. Sanders challenges the ALJ's Step Three findings, arguing first that the ALJ erred in finding his physical impairments did not satisfy Listing 1.07, and second that she erred in finding his mental health impairments did not satisfy Listings 12.04 or 12.15.  (ECF Doc. 14 pp. 11-18.) The Commissioner contends that Mr. Sanders has not satisfied his burden at Step Three because he has done nothing more than point to subjective complaints and argue the ALJ should have

assessed the evidence differently.  (ECF 16-1 pp. 25-29.)  Mr. Sanders' listings arguments at

Step Three are addressed in turn below.

### i.   Whether ALJ Finding that Physical Impairments Did Not Satisfy Listing 1.07 was Supported by Substantial Evidence

Mr. Sanders argues first that the ALJ erred at Step Three in finding that his physical

impairments did not satisfy Listing 1.07.[5]  (ECF Doc. 14 pp. 11-12.)  To satisfy Listing 1.07

during the applicable time-period, Mr. Sanders was required to demonstrate the following:

> Fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.07 (Eff. May 21, 2020 to April 1, 2021).  In considering

this listing, the ALJ found "the evidence [did] not establish the claimant's fracture of upper limb

(left shoulder) would cause him to meet or medically equally listing 1.07."  (Tr. 64.)  Mr.

Sanders challenges this finding, arguing that "[e]ven if the nondisplaced fracture did not qualify

as a fracture with nonunion" he satisfies Listing 1.07 because "he had not regained use of his left

upper extremity after 12 months."  (ECF Doc. 14 pp. 12, 16.)

Mr. Sanders' argument falls short.  As reflected in both the imaging and his diagnoses,

the relevant fracture was in the scapula, not the shaft of the humerus, radius, or ulna.  (Tr. 68, 69,

375, 380, 381, 386, 472, 483.)  There is also no evidence of a nonunion "under continuing

surgical management," as there was no surgical management.  In August 2018, Dr. Vallier found

the fracture was "amenable to nonoperative management." (Tr. 68-69, 375.)  In October 2018,

---

[5] Mr. Sanders also makes brief reference to Listing 1.02, to which the Commissioner has provided a response.  (ECF Doc. 14 p. 11; ECF Doc. 16-1 p. 26.)  However, a review of the briefing reflects that Listing 1.07 is the only physical listing Mr. Sanders actually contends was satisfied here.  (See ECF Doc. 14 p. 16 ("Sanders satisfied the criteria of either Listing 1.07 . . . 12.04 . . . or 12.15.").)  To the extent he intended to advance a specific argument as to Listing 1.02, any such argument was not sufficiently articulated and was therefore waived.  *See McPherson*, 125 F.3d at 995–996.  Thus, no review of the ALJ's findings relative to Listing 1.02 is warranted.

Dr. Como also saw "no indication for surgical intervention" for the nondisplaced fracture.  (Tr. 69, 361-63.)  Mr. Sanders also pointed to no evidence that nonunion lasted more than twelve months, and appears to acknowledge that lack of evidence.  (ECF Doc. 14 p. 12 (stating "[e]ven if the nondisplaced fracture did not qualify as a fracture with nonunion . . .").)  Finally, Mr. Sanders failed to present evidence that "functional use" of his left upper extremity was not restored within twelve months.  (*Cf.* Tr. 328-29 (2/11/19 orthopedics visit: "[h]e has resumed activities with the left shoulder and was given no restrictions by me" but has not returned to heavy work "because of concerns regarding his shoulder"; exam shows normal scapulorthoracic and glenohumeral motion with 5/5 strength, but reports of diffuse pain "with certain overhead and above head reaching activities"); Tr. 911-13 (6/28/19 office visit: exam shows normal motion and intact sensation in left upper extremity, with tenderness to palpation over injury).)

The burden at Step Three rests with Mr. Sanders.  *Johnson*, 2014 WL 1418142, at *3.  The undersigned finds that Mr. Sanders has failed to satisfy his burden of showing that his left shoulder impairment met or equaled Listing 1.07.  He has not presented "specific medical findings that satisfy" the criteria of Listing 1.07 and he has not "present[ed] medical evidence which describes how the impairment has such equivalency."  *See Thacker*, 93 Fed. App'x at 728.  The undersigned also finds that the ALJ's conclusion that Mr. Sanders' shoulder impairment did not meet or medically equal Listing 1.07 was supported by substantial evidence.

### ii.    Whether ALJ Finding that Mental Impairments Did Not Satisfy Listings 12.04 or 12.15 is Supported by Substantial Evidence

Mr. Sanders also argues that the ALJ erred at Step Three when she found that he had no or moderate limitations in the four categories of mental functioning, and therefore did not satisfy the criteria of Listings 12.04 and 12.15.  (ECF Doc. 14 pp. 13-18.)  These listings deal with the mental disorders: depressive, bipolar and related disorders (12.04) and trauma- and stressor-

related disorders (12.15).  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.04, 12.15 (Eff. March 14, 2018 to April 1, 2021).  Both listings incorporate identical paragraph B criteria, which provide an analysis used to rate the severity of mental impairments in four general areas of functioning.  20 C.F.R. §§ Pts. 404.  Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing.  20 C.F.R. § 404.1520a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E.  Mr. Sanders argues that "[t]he limitations described by the ALJ, and as reported by Sanders documented serious limitations in [his] ability to function independently, appropriately, effectively, and on a sustained basis to <u>interact with others</u>, <u>concentrate, persist or maintain pace</u>, and <u>adapt or manage himself</u>."  (ECF Doc. 14 p. 15 (emphasis added).)  The analysis will accordingly focus on these three functional areas.

As an initial matter, it is noted that the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

The ALJ provided a detailed analysis in support of her findings regarding Mr. Sanders' level of limitation in each of the "B" criteria functional areas.  (Tr. 65-66.)  With respect to the three functional areas Mr. Sanders challenges, the ALJ explained her findings as follows:

> In <u>interacting with others</u>, the claimant has a <u>moderate limitation</u>. The claimant testified that he did not leave the house as much as before his traumatic injury in

August 2018 and has difficulty dealing with the public and engaged in self-isolation. At times, the claimant was noted to have irritable behavior and paranoid thoughts. (2F, 2-4, 38-42, 48-49, 55-56, 75-76, 82-86, 106-108; 4F, 205- 206; 7F, 12-14; 9F, 21-23, 27-29, 37-39, 43-45, 67-72). However, other mental status findings showed that the claimant had cooperative, calm, and/or appropriate behavior. (2F, 2-4, 38-42, 48-49, 55- 6, 75-76, 82-86, 106-108; 4F, 192-195, 205-206; 5F, 9-11; 7F, 12-14; 8F, 77-79; 9F, 21-23, 27-29, 37-39, 43-45, 55-57, 67-72; 10F, 36-38, 42-44, 48-50). In December 2019, the claimant reported traveling to Atlanta to see his best friend. (9F, 55). He testified that he lived with his wife. Therefore, the evidence supports a finding that the claimant has no more than a moderate limitation in this area.

With regard to <u>concentrating, persisting or maintaining pace</u>, the claimant has <u>no limitation</u>. He testified that he experienced concentration difficulties. He reported difficulty with completing tasks. (4E). However, treatment records reflect findings of sustained attention span and concentration. (2F, 2-4, 38-42, 48-49, 55-56, 75-76, 82-86, 106-108; 4F, 192-195, 205-206; 5F, 9-11; 7F, 12-14; 8F, 77-79; 9F, 21-23, 27-29, 37-39, 43-45, 55-57, 67-72; 10F, 36-38, 42-44, 48-50). He testified that he was able to drive and complete some household chores. The claimant reported being able to count change. (4E). Therefore, the evidence supports a finding that the claimant has no limitation in this area.

As for <u>adapting or managing oneself</u>, the claimant has experienced a <u>moderate limitation</u>. He testified that he had trouble with paranoia, nightmares, and leaving the house. At times, the claimant was found to have a dysphoric, depressed, slightly depressed, and/or anxious mood, tearful affect, irritable behavior, and paranoid thoughts. (2F, 2-4, 38-42, 48-49, 55-56, 75-76, 82-86, 106-108; 4F, 205-206; 7F, 12-14; 9F, 21-23, 27-29, 37-39, 43-45, 67-72). However, at other times, the claimant had a euthymic mood, full range affect, a well groomed appearance or adequate grooming, and good hygiene. (2F, 2-4, 38-42, 48-49, 55-56, 75-76, 82-86, 106-108; 4F, 192-195, 205-206; 5F, 9-11; 7F, 12-14; 8F, 77-79; 9F, 21-23, 27-29, 37-39, 43-45, 55-57, 67-72; 10F, 36-38, 42-44, 48-50). The claimant reported being able to take care of his personal hygiene. (4E). He testified that he was able to drive and complete some household chores. Therefore, the evidence supports a finding that the claimant has no more than a moderate limitation in this area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 65-66 (emphasis added).)

Mr. Sanders asserts that the ALJ's findings were in error because she should have found marked limitations in "at least two" of the specified functional areas. (ECF Doc. 14 pp. 13-16.) More specifically, he argues the ALJ's findings of "no limitations" in concentrating, persisting,

and maintaining pace and "moderate limitations" in interacting with others and adapting or managing oneself "were contrary to [Mr.] Sanders' testimony that he could not work as he had limitations with reaching or lifting without pain and a lack of focus" and his psychological problems due to the fact that "the neighbor who shot him still lived behind him."  (*Id.* at p. 14.)

In support of his argument that the ALJ should have found marked limitations in at least two functional categories, Mr. Sanders relies primarily on his own subjective reports of activities and symptoms in his hearing testimony, function report, and reports to providers.  (*Id.* at pp. 14-15 (citing testimony (Tr. 97, 100, 102, 108), function report (Tr. 252-53, 257-58), and reports to providers (Tr. 646-47, 730, 733, 1007-8, 1510, 1541, 1553, 1559, 1574).)  In particular, he highlights his own reports of a lack of focus, depression, difficulty sleeping, nightmares, being uncomfortable around people, being afraid to go outside and unable to trust others, and being hypervigilant.  (*Id.*)  The only non-subjective evidence cited by Mr. Sanders in support of his mental listings argument is a single examination showing a depressed and anxious mood (*id.* at p. 14 (citing Tr. 992)) and a therapy treatment plan to "[r]educe agoraphobia" (*id.* (Tr. 1600)).  In light of this evidence, Mr. Sanders contends the ALJ's findings of no to moderate limitations in the specified areas were "not supported by substantial evidence."  (*Id.* at p. 15.)

Contrary to Mr. Sanders' argument, a review of the ALJ decision reveals she explicitly considered the subjective reports regarding activities and symptoms outlined in Mr. Sanders' brief.  At Step Three, she acknowledged his reports that he had trouble remembering, did not leave the house as much, had difficulty dealing with the public, engaged in self-isolating, had concentration difficulties, had difficulty completing tasks, and had trouble with paranoia, nightmares and leaving the house.  (Tr. 65.)  At Step Four, she considered his reports of vivid nightmares, hypervigilance, difficulty leaving his house, feeling disconnected from friends, and

39

life and family stressors.  (Tr. 71-73.)  Nevertheless, after a review of the evidence as a whole,

the ALJ concluded that Mr. Sanders' statements concerning the limiting effects of his symptoms

were "not entirely consistent with the medical evidence and other evidence in the record" (Tr.

67), as supported by her detailed and thorough discussion of the evidence at Steps Three and

Four. [6]  (Tr. 65-66, 71-75.)

Mr. Sanders asserts that "[t]he conclusions cited by the ALJ were not based on the

evidence in the record" (ECF Doc. 14 p. 15), but a review of the decision and underlying

evidence demonstrates this assertion is not correct.  At Step Three, in addition to acknowledging

the subjective reports highlighted in Mr. Sanders' brief, the ALJ accurately noted his additional

reports that he was able to drive, could complete some household chores, could count change,

had traveled to Atlanta to see a friend, lived with his wife, and took care of his personal hygiene.

(Tr. 65-66.)  Further, while the ALJ acknowledged objective findings supportive of some

limitations – including irritable behavior, paranoid thoughts, tearful affect, and moods that were

dysphoric, depressed, slightly depressed, and/or anxious – she also noted objective findings

suggestive of fewer limitations – including cooperative, calm, and/or appropriate behavior,

sustained attention span and concentration, euthymic mood, full range of affect, memory within

normal limits, and good hygiene, adequate grooming, and a well-groomed appearance.  (Tr. 65

(citing records).)  At Step Four, the ALJ discussed Mr. Sanders' counseling and medication

management treatment in detail (Tr. 71-73), as well as the medical opinions of the state agency

psychological consultants who concluded Mr. Sanders "was capable of occasional intermittent

interactions with others and routine tasks with regular expectations and few changes" (Tr. 74; *see*

---

[6] Mr. Sanders has not articulated a direct, developed, or clearly articulated challenge to the ALJ's
evaluation of his subjective allegations regarding mental health symptoms, and any such challenge is accordingly
waived.  *See McPherson*, 125 F.3d at 995–996.

*also* Tr. 127-28, 145-46 (finding no more than moderate limitations in any functional category)). This recitation of record evidence was both accurate and supportive of the ALJ's findings.

Mr. Sanders' conclusory argument that the "ALJ misstated the evidence when discussing the functional limitations related to Listings 12.04 and 12.15" (ECF Doc. 14 p. 17) is unavailing, as he provides neither citations nor specific argument that would support a finding that the ALJ mischaracterized or omitted any material evidence. Certainly, the ALJ was not required to specifically discuss every piece of evidence in order to render a decision supported by substantial evidence. *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).

Finally, Mr. Sanders makes a cursory suggestion that the ALJ inappropriately relied on his ability to perform some activities on a limited basis as substantial evidence that his symptoms were not disabling. (ECF Doc. 14 p. 16 (citing *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015) and *Elliott v. Comm'r of Soc. Sec.*, No. 1:20-CV-00545, 2021 WL 2926109, at *15 (N.D. Ohio June 29, 2021), *report and recommendation adopted,* No. 1:20 CV 545, 2021 WL 2917647 (N.D. Ohio July 12, 2021).) This argument is not convincing, as the record makes it clear that the ALJ did not rely on Mr. Sanders's activities alone in making her Step Three findings. (Tr. 65-66.) Additionally, it is noted that Mr. Sanders has not shown that the ALJ's decision was based on unsupported factual conclusions or that she minimized or failed consider material evidence. *Cf. Elliott*, 2021 WL 2926109 at *15.

Ultimately, Mr. Sanders' argument that the ALJ erred in evaluating the mental listings amounts to a request for this Court to consider the same evidence evaluated by the ALJ, but to

weigh that evidence differently.  Because it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility," *Garner*, 745 F.2d at 387, that request must be denied.  Based on a review of the ALJ decision and the underlying records, the undersigned finds that the ALJ clearly articulated the basis for her finding that Mr. Sanders' mental health impairments caused no more than moderate limitations, and that her Step Three determination as to Mr. Sanders' mental impairments is supported by substantial evidence.

For the reasons set forth above, the undersigned finds no basis to remand this matter for further evaluation of Mr. Sanders' physical or mental health impairments at Step Three.

## 2.    Whether RFC is Supported by Substantial Evidence at Step Four

Mr. Sanders next contends that substantial evidence does not support the ALJ's RFC finding at Step Four because the ALJ failed to consider the combination of his impairments and did not properly consider his allegations of pain when formulating the RFC.  (ECF Doc. 14 pp. 12-13, 18—20, ECF Doc. 17 pp. 1-2.)  The Commissioner responds that the ALJ properly considered the effects of obesity in combination with other impairments and properly considered Mr. Sanders' pain when assessing his RFC.  (ECF Doc. 16-1 pp. 29-35.)  These arguments are addressed below.

### i.    Whether ALJ Properly Considered Musculoskeletal Impairments in Combination with Obesity When Assessing the RFC

Mr. Sanders argues the physical RFC is not supported by substantial evidence because the ALJ did not properly consider his musculoskeletal impairments in combination with his obesity when assessing a light RFC.  (ECF Doc. 14 pp. 12-13, ECF Doc. 17 pp. 1-2.)

Social Security Ruling 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment (MDI) of obesity," and how SSA "evaluate[s] obesity in disability claims."  SSR 19-2p, 84 Fed. Reg. 22924, 22924 (May 20, 2019).  In

particular, SSR 19-2p provides that "[t]he combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment."  *Id*. at 22925-26; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation") (citations omitted).

The ALJ clearly discussed the effects of Mr. Sanders' obesity in combination with his other impairments.  First, she found obesity to be a severe impairment at Step Two.  (Tr. 63.) Next, she explained at Step Three:

> [W]hile there are no listings which specifically address obesity, SSR 19-2p outlines that obesity is a medically determinable impairment that commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, endocrine, and musculoskeletal body systems. Disturbance of these systems can be a major cause of disability in individuals with obesity. Therefore, obesity must be considered when determining whether an individual has a listing level or combination of impairments. Similarly, when assessing a claim at other steps of the sequential process, to include when assessing an individual's residual functional capacity, consideration must be given to any additional and cumulative effects of obesity. I considered the claimant's obesity at all steps of the evaluation process, as outlined in SSR 19-2p. However, there is no evidence that the claimant's obesity alone, or in combination with another impairment, meets or medically equals a listing.

(Tr. 64 (emphasis added).)  At Step Four, the ALJ discussed and considered obesity again in combination with Mr. Sanders' other impairments, explaining he "has a history of fractures of upper limb (left shoulder), other and unspecified arthropathies (bilateral knee patellofemoral chondromalacia; status post left medial meniscectomy and chondroplasty), obesity, trauma and stressor-related disorders, and depressive, bipolar, and related disorders."  (Tr. 67 (emphasis added).)  She went on to detail specific evidence regarding Mr. Sanders' obesity, explaining his

"longitudinal examinations include body mass index (BMI) scores of 30 or above and show a consistent pattern of obesity [and] [r]ecords reflect that the claimant's highest weight was 246 pounds and his highest BMI was 34.35." (Tr. 70-71 (citing records).)  In light of this evidence, the ALJ found "due to his obesity [Mr. Sanders] experienced greater functional limitations than might be expected from his other severe impairments alone" and explained that she had accounted for those functional limitations "in the residual functional capacity [as] articulated" in the decision.  (Tr. 71.)

Notwithstanding the ALJ's clear discussion and consideration of Mr. Sanders' obesity throughout the decision, Mr. Sanders contends that the ALJ "erroneously found that he could stand/walk for 6 hours per day." (ECF Doc. 14 p. 12.)  The only objective evidence cited by Mr. Sanders in support of this argument was a June 2018 x-ray of his left knee and a July 6, 2018 MRI of his left knee.  (*Id.* (citing Tr. 490-92, 494); ECF Doc. 17 p. 1 (same).)  There is no dispute that the ALJ described, cited to, and considered the left knee MRI findings in her analysis at Step Four.  (Tr. 67-68 (citing Tr. 489-92).)  The only other evidence cited by Mr. Sanders as supportive of this argument was his own testimony that he could only stand for thirty to forty-five minutes without having pain and needing to walk around.  (ECF Doc. 14 p. 12 (citing Tr. 107).)  This testimony was also explicitly noted and considered by the ALJ at Step Four.  (Tr. 67.)  Given that the ALJ considered the impact of obesity and specifically addressed the objective findings and the testimony highlighted in Mr. Sanders' briefs, it appears that Mr. Sanders is seeking either a reweighing of the evidence by this Court or arguing that heightened credence should be given to his subjective complaints.

It is well-established that the ALJ was not required to accept Mr. Sanders' subjective allegations as true or incorporate them into the RFC.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d

469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints.").  It is additionally well-established that it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence."  *Garner*, 745 F.2d at 387.  Since Mr. Sanders has neither identified evidence the ALJ failed to consider nor demonstrated that the ALJ erred in her consideration of the record as a whole, he has not met his burden to demonstrate that she erred in assessing the relationship between Mr. Sanders obesity and his musculoskeletal impairments.

It is additionally noted that the left knee imagery identified by Mr. Sanders pre-dated his left knee arthroscopy in October 2018 (Tr. 363-65), after which related treatment was largely limited to eight sessions of physical therapy ending in February 2019 (Tr. 329-47).  This treatment was specifically discussed and considered by the ALJ.  (Tr. 67-68, 70, 72-73.)  The ALJ also explicitly noted and considered evidence that Mr. Sanders denied active left knee symptoms in February 2019, worked on a deck in May 2019, and performed some subcontracting work in September 2019.  (Tr. 73 (citing Tr. 328-29, 663-67, 1147.)  Having considered the entirety of the record, the ALJ explained her physical RFC finding, stating:

> In order to avoid exacerbating the claimant's fractures of upper limb (left shoulder), other and unspecified arthropathies (bilateral knee patellofemoral chondromalacia; status post left medial meniscectomy and chondroplasty) and to account for the claimant's obesity, he could lift and carry 20 pounds occasionally and 10 pounds frequently, he can stand and/or walk for a total of six hours in an eight-hour workday, he can sit for a total of six hours in an eight-hour workday, he could frequently push and pull with the left upper extremity, he could frequently climb ramps and stairs, he could occasionally climb ladders, ropes, and scaffolds, he could frequently kneel and crouch, he could occasionally crawl, he could occasionally perform left overhead reaching, he could frequently perform left reaching in the front and laterally, he could frequently be exposed to extreme cold, and he could never be exposed to hazards of unprotected heights.

(Tr. 73-74 (emphasis added).)

While Mr. Sanders argues that the ALJ's "[f]ailure to consider the totality of his impairments in combination with his obesity" was "harmful and reversible error" (ECF Doc. 14

45

p. 13), a review of the decision makes it clear that the ALJ considered Mr. Sanders' physical impairments and obesity in assessing the medical evidence and finding that the evidence supported a light RFC. Accordingly, the undersigned finds no basis to remand this matter for further evaluation of Mr. Sanders' obesity and its effect on the RFC.

### ii. Whether ALJ Considered Mr. Sanders' Symptoms, Including Pain, And Sufficiently Articulated the Basis for the RFC Finding

Mr. Sanders also argues that the RFC is not supported by substantial evidence because the ALJ did not properly consider his symptoms, especially pain. (ECF Doc. 14 pp. 18-20.) Specifically, he asserts the ALJ failed to consider his "disabling pain related to the bullet fragment remaining in the left chest wall between the inferior scapula and poster lateral 7th rib with a nondisplaced fracture of the inferior left scapula," which reportedly caused him pain and limitation of motion in his left upper extremity despite two rounds of physical therapy and an "inability to sustain and/or maintain attention and concentration." (*Id.* at p. 18 (citing Tr. 483, 666, 911, 1097).) Mr. Sanders also claims "the ALJ failed to address the fact that he had significant strength deficits in the left shoulder and was limited with functional mobility lifting, reaching, and carrying," arguing that his pain with overhead activity "preclude[ed] him from performing repetitive overhead work." (*Id.* at p. 19 (citing Tr. 303, 666).) Based on these grounds, he asserts "[t]his matter should be remanded to consider whether the effects of his pain symptoms would interfere with his ability to maintain attention and concentration and/or sustain work activity."[7] (*Id.* at 18.)

---

[7] Mr. Sanders' additional perfunctory assertion that the ALJ failed to consider the combination of Mr. Sanders' physical and psychological impairments (ECF Doc. 14 p. 19) lacks a developed or clearly articulated argument – being supported by nothing more than a reference to earlier arguments that were found to be without merit – and is accordingly deemed waived. *See McPherson*, 125 F.3d at 995-96.

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  When the alleged symptom is pain, the ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  There is no dispute that the first step is met in this case (Tr. 63, 67), so the discussion herein will focus on the second step.

A review of the decision reveals that the ALJ considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.  The ALJ acknowledged Mr. Sanders' testimony "that he had difficulty with reaching overhead and in front and lifting overhead after suffering a traumatic injury" and "that when he moved his left shoulder in certain positions he got a sharp pain where a bullet was located."  (Tr. 67.)  Nevertheless, she concluded that Mr. Sanders' "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record

47

for the reasons explained in this decision." (*Id.*)  In support, she provided a detailed discussion of Mr. Sanders' gunshot wound injury and related treatment, including his initial emergency department treatment with a same-day discharge (Tr. 68 (citing Tr. 378-86, 477, 482-86)), orthopedics consults with recommendations for nonoperative management (Tr. 68-69 (citing Tr. 361-63, 374-76)), continued orthopedic evaluation and treatment records showing nearly symmetrical range of motion but continued mild aching, pain, and stiffness with extremes of motion and heavy lifting (Tr. 69-70 (citing Tr. 328-29, 360, 472, 475)), a physical therapy evaluation showing full but painful range of motion with significant strength deficits in the left shoulder (Tr. 69 (citing Tr. 354-58)), physical therapy records showing tenderness to palpation and continued complaints of pain, but normal motion and intact sensation, and a specific report of pain "while working on a deck" (Tr. 70 (citing Tr. 303-58, 663-67, 872-81)), and further treatment records showing normal motion and intact sensation, tenderness to palpation, and complaints of dull, intermittent, and chronic pain, with conservative treatment limited to physical and pool therapy, a TENS unit, and prescriptions for tizanidine and gabapentin (*id.* (citing Tr. 908-21, 948-55, 1032-43, 1054-98, 1106-8, 1114-17)).

The ALJ also considered the opinions of the state agency medical consultants, who recommended limitations to frequent pushing, pulling, and front/lateral reaching with the left upper extremity and occasional overhead reach with the same, finding the opinions to be persuasive and supported by the clinical findings.  (Tr. 74.)  In that context, she further held that:

> [T]he claimant's alleged level of limitation is not fully supported by other clinical findings that include <u>no appreciable palpable foreign body in the back and the paraspinal muscles around the scapula, normal and symmetrical appearing scapulothoracic motion when compared to the unaffected side, intact sensation</u>, no left knee crepitus, no right knee effusion or tenderness, no mechanical block or instability, <u>intact distal CMS, no appreciable palpable foreign body in the back and the paraspinal muscles around the scapula</u>, normal gait, excellent coordination and balance, and <u>no distress</u>.

(Tr. 74 (emphasis added; citations omitted).) As a review of the decision makes clear, the ALJ did not fail to consider or account for limitations associated with pain or mobility restrictions associated with his left shoulder impairment. The RFC limited Mr. Sanders to light work with the following additional limitations:

> frequent push and pull with the left upper extremity, he can frequently climb ramps and stairs, he can occasionally climb ladders, ropes, and scaffolds, he can frequently kneel and crouch, he can occasionally crawl, he can occasionally perform left overhead reaching, he can frequently perform left reaching in the front and laterally, he can frequently be exposed to extreme cold, he can never be exposed to hazards of unprotected heights, he can occasionally interact with supervisors, co-workers, and the public, and he is limited to routine workplace changes.

(Tr. 66.) Mr. Sanders has not met his burden to demonstrate that the ALJ erred in considering his subjective complaints of pain at Step Four of the sequential analysis.

It is noted that Mr. Sanders' additional assertion that the ALJ "failed to articulate any rationale beyond the boilerplate paragraph finding that [Mr. Sanders'] symptoms were not entirely consistent with the medical evidence" (ECF Doc. 14 p. 19 (citing Tr. 67) is without merit. The referenced paragraph explicitly indicated that the finding was based on "the reasons explained in this decision" (*id.*), which were outlined in some detail above. It is further observed that although the ALJ found Mr. Sanders' subjective allegations not entirely consistent, she nevertheless found that functional limitations as noted above were warranted. (Tr. 73-74.)

The court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. As recently explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the same decision on [the] record. When determining whether to affirm the

Commissioner's decision, [the court] need not "agree with the Commissioner's finding"; [the court] instead ask[s] whether the decision followed legal standards and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022)

(citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)  Here, although Mr.

Sanders continued to report pain, he has not demonstrated that the ALJ's finding that his pain

was not entirely disabling lacked adequate explanation or was unsupported by substantial

evidence.  Further, Mr. Sanders has not demonstrated that the ALJ failed to follow the

appropriate legal standards or that the RFC lacked the support of substantial evidence.

For all of the reasons stated above, the undersigned finds no basis to remand this matter

for further evaluation of Mr. Sanders' pain or further articulation of the RFC finding.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

May 23, 2022                                    */s/ Amanda M. Knapp*
                                               AMANDA M. KNAPP
                                               UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).